# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**SEAN McQUESTION**
                    **Plaintiff,**

        **v.**                                    **Case No. 08-C-1120**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
                    **Defendant.**

---

### DECISION AND ORDER

In May 2005, plaintiff Sean McQuestion applied for disability insurance benefits ("DIB"), claiming inability to work since September 2, 2003, due to chronic obstructive arterial disease and a herniated lumbar disc. (Tr. at 45; 49; 59.) Plaintiff alleged that because of these conditions he could not walk any distance without pain and tingling in his legs, could not lift or carry anything heavy, and could not stand for long periods. He claimed to be in constant pain, relieved only by laying down. (Tr. at 49.) He indicated that he underwent surgery in September 2003, which helped, but he never sufficiently recovered to return to work. (Tr. at 50; 66.)

Because plaintiff's disability insurance lapsed as of June 30, 2004 (his "date last insured"), he had to establish disability prior to that date. See Stevenson v. Chater, 105 F.3d 1151, 1154 (7th Cir. 1997). The Social Security Administration ("SSA") determined that he failed to do so on initial review (Tr. at 27; 35) and on plaintiff's request for reconsideration (Tr. 26; 30). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (Tr. at 28), and on April 3, 2008, he appeared with counsel before ALJ Robert Bartelt (Tr. at 279). In a decision dated September 18, 2008, the ALJ also determined that plaintiff was not disabled.

(Tr. at 11-16.) When the SSA's Appeals Council denied plaintiff's request for review (Tr. at 3), the ALJ's decision became final. See Nelms v. Astrue, 553 F.3d 1093, 1097 (7th Cir. 2009). Plaintiff now seeks judicial review of that decision under 42 U.S.C. § 405(g).

## I. APPLICABLE LEGAL STANDARDS

### A.    Judicial Review

Judicial review under § 405(g) is limited to determining whether the ALJ's decision is supported by "substantial evidence" and free of harmful legal error. Nelms, 553 F.3d at 1097. Evidence is "substantial" if it is sufficient for a reasonable mind to accept as adequate to support the decision. Ketelboeter v. Astrue, 550 F.3d 620, 624 (7th Cir. 2008). Accordingly, if conflicting evidence in the record would allow reasonable people to differ as to whether the claimant is disabled, the ALJ's decision to deny the application must be upheld. See, e.g., Lee v. Sullivan, 988 F.2d 789, 793-94 (7th Cir. 1993). The court may not re-weigh the evidence, resolve evidentiary conflicts, decide questions of credibility, or substitute its judgment for the ALJ's. Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000).

However, this does not mean that the court acts as an "uncritical rubber stamp." Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984). The court must review the entire record, considering both the evidence that supports, as well as the evidence that detracts from, the ALJ's decision. Briscoe v. Barnhart, 425 F.3d 345, 351 (7th Cir. 2005). The court may not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the decision fails to provide an accurate and logical bridge between the evidence and the result, Blakes v. Barnhart, 331 F.3d 565, 569 (7th Cir. 2003) (citing Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002); Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996)), lacks a meaningful

2

discussion of important evidence, see, e.g., Giles v. Astrue, 483 F.3d 483, 486 (7th Cir. 2007);

Briscoe, 425 F.3d at 351, or rests upon flawed logic or serious errors in reasoning, see, e.g.,

Indoranto v. Barnhart, 374 F.3d 470, 475 (7th Cir.2004) (citing Carradine v. Barnhart, 360 F.3d

751, 754-56 (7th Cir. 2004)).  Similarly, if the ALJ commits an error of law, reversal is "required

without regard to the volume of evidence in support of the factual findings." Binion v. Chater,

108 F.3d 780, 782 (7th Cir. 1997).  The ALJ commits legal error if he fails to comply with the

SSA's regulations and rulings for evaluating disability claims. See, e.g., Giles, 483 F.3d at 488;

Golembiewski v. Barnhart, 382 F.3d 721, 724 (7th Cir. 2004).

**B.    Disability Standard**

In order to be found disabled, the claimant must be unable "to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Further, where, as

here, the claimant seeks DIB, he must establish disability while in insured status.  See

Stevenson, 105 F.3d at 1154; see also 20 C.F.R. § 404.130 (setting forth methods of

determining insured status based on previous earnings).

The SSA has adopted a sequential, five-step test for determining disability, pursuant to

which the ALJ asks:

(1)    Has the claimant engaged in substantial gainful activity ("SGA") since his alleged
       onset of disability?

(2)    If not, does he suffer from a severe, medically determinable impairment?

(3)    If so, does that impairment meet or equal any impairment listed in SSA
       regulations as presumptively disabling?

(4)    If not, does he retain the residual functional capacity ("RFC") to perform his past

3

work?

  (5)  If not, can he perform other jobs existing in significant numbers?

See, e.g., Villano v. Astrue, 556 F.3d 558, 561 (7th Cir. 2009).

  The claimant bears the burden of presenting evidence at steps one through four, but if he reaches step five the burden shifts to the Commissioner to show that the claimant can make the adjustment to other work. See, e.g., Briscoe, 425 F.3d at 352. The Commissioner may carry this burden by either relying on the Medical-Vocational Guidelines, commonly known as "the Grid," a chart that classifies a person as disabled or not disabled based on his age, education, work experience and exertional ability, or by summoning a vocational expert ("VE") to offer an opinion on other jobs the claimant can do despite his limitations. See, e.g., Herron v. Shalala, 19 F.3d 329, 336-37 (7th Cir. 1994). However, because the Grid considers only exertional (i.e., strength) limitations, if the claimant has significant non-exertional limitations, such as pain, or mental, sensory or postural limitations, the ALJ may not rely solely on the Grid and must consult a VE for a more refined assessment. See Luna v. Shalala, 22 F.3d 687, 691 (7th Cir. 1994); Herron, 19 F.3d at 336-37.

## II. FACTS AND BACKGROUND

**A. Medical Evidence**

  **1. Treating Providers**

  In August 2003, plaintiff sought treatment from Dr. John Zwiacher based on a diagnosis of peripheral vascular disease and symptoms of leg pain and cramping. (Tr. at 159; 162-64.) An MRI/MRA of plaintiff's legs revealed stenosis[1] of the left distal common iliac artery, right

---

  [1]"Stenosis" is a stricture of a canal or orifice. Stedman's Medical Dictionary 1695 (27th ed. 2000).

4

external iliac artery and mid-right superficial femoral artery (Tr. at 152-53), and on September 10, 2003, plaintiff underwent an angioplasty of the right external iliac artery and left common iliac artery (Tr. at 149-50). In a September 18, 2003 letter, Dr. Zwiacher wrote that plaintiff still had some numbness in his left foot, but his blood pressure had improved and he could get around with minimal claudicative symptoms.[2] Dr. Zwiacher concluded that plaintiff experienced significant improvement in his vascular status with the surgery, particularly on the left side, but believed that plaintiff at some point may need a bypass. He suggested waiting until the vascular disease had progressed in order to make that decision. (Tr. at 161.)

In May of 2005, plaintiff began experiencing low back problems, with numbness and radicular pain from his buttocks to his feet. Plaintiff told Dr. Michael Plooster that he took a bad fall five years previously and experienced off and on back problems since then, but his severe symptoms started one month ago. (Tr. at 224.) Dr. Plooster prescribed Vicodin for pain and ordered an MRI (Tr. at 224), which revealed a large extruded disc fragment compressing the thecal sac at the L4-L5 level (Tr. at 222-23). Dr. Plooster recommended surgery (Tr. at 221), and on May 19, 2005, plaintiff underwent a partial hemilaminectomy with discectomy at L4-L5 (Tr. at 103-14). When seen in follow-up on May 31, plaintiff noted some continued soreness and mild sciatica, which Dr. Plooster found not unexpected given the size of the disc herniation. Dr. Plooster advised that plaintiff soak, work on range of motion, and avoid twisting, turning and bending. (Tr. at 219-20.) On June 28, 2005, Dr. Plooster found plaintiff to be doing quite well overall, with no radiculopathy on the right but some problems with circulation in his left leg. (Tr. at 218.) Plaintiff continued to do well on August 2, 2005. (Tr. at 217.)

---

[2]"Claudication" means attacks of lameness and pain, brought on by walking, chiefly in the calf muscles. Stedman's Medical Dictionary 360 (27th ed. 2000).

5

Plaintiff returned to Dr. Zwiacher on November 10, 2005, complaining of claudication, primarily in his calves. Dr. Zwiacher noted that most of plaintiff's ischemic[3] issues above the knees were addressed by the August 2003 surgery, and the significant leg and buttocks pain plaintiff experienced on short distance ambulation significantly improved. However, plaintiff's left foot showed vascular changes, and Dr. Zwiacher ordered an MRA to determine the significance of the disease and whether plaintiff needed additional intervention. (Tr. at 158.) The MRA revealed significant bilateral peripheral vascular disease (Tr. at 158), with bilateral obstructions of the superficial femoral arteries (Tr. at 148) and mild atherosclerotic change in the iliac arteries (Tr. at 151).

Following additional testing, treatment and evaluation (Tr. at 165-70; 171-72; 173-81; 185-87; 188-206; 214-15; 225-29), and with worsening left lower extremity claudication, plaintiff underwent bypass surgery with a vein graft on January 25, 2007 (Tr. at 230-44). On his three month follow-up visit, plaintiff denied any lower extremity claudication but did report toe pain and numbness, especially on the left side, as well as numbness below the knee. Nurse Practitioner ("NP") Nicole Amass noted mild left lower extremity ischemia at rest, which improved with exercise, and moderate to severe right lower extremity ischemia at rest and with exercise. (Tr. at 247.) On October 15, 2007, plaintiff reported feeling much better, with remarkably improved left leg circulation, little left leg pain and occasional right leg pain. (Tr. at 249-50.) On October 26, 2007, plaintiff reported that he had been able to walk a mile and a half to two miles with his dog, pain free, but complained of some right calf claudication with hills or stairs. NP Amass reported moderate right lower extremity ischemia at rest and with

_____

[3]Ischemia refers to local anemia due to mechanical obstruction (mainly arterial narrowing or disruption) of the blood supply. Stedman's Medical Dictionary 924 (27th ed. 2000).

6

exercise, and mild left lower extremity ischemia at rest and with exercise.  (Tr. at 254-55.)[4]

### 2. SSA Consultants

On July 18, 2005, Dr. Pat Chan completed a physical RFC assessment for the SSA, finding plaintiff capable of medium work (i.e., lifting up to fifty pounds occasionally, twenty-five pounds frequently; standing/walking six hours in an eight hour day; sitting six hours in an eight hour day; and pushing/pulling in unlimited fashion), with no non-exertional limitations.  (Tr. at 128-35.)  Another consultant reviewed and affirmed the assessment on August 31, 2005.  (Tr. at 135.)

## B. Hearing Testimony

### 1. Plaintiff

Plaintiff testified that he was fifty-four years old, 6' tall and 189 pounds, with a GED level education.  (Tr. at 282.)  He identified past employment operating a metal shearing machine, which required him to stand most of the day and lift forty to sixty pounds (Tr. at 293; 298); operating a press machine in a chicken processing plant, also performed standing, with lifting up to eighty pounds (Tr. at 298-99); and working in a foundry as a furnace operator, which required lifting stones up to fifty or sixty pounds and shoveling up to 200 pounds (Tr. at 299-300).

Plaintiff stated that his peripheral artery disease clogged his arteries, cutting off oxygen to his legs, causing constant pain.  In order to relieve the pain he laid down and raised his legs level with or above his heart, something he did most of the day, every day.  (Tr. at 284.)  He

---

[4]Plaintiff submitted additional records to the Appeals Council.  (Tr. at 258-76.)  Although these materials are technically part of the administrative record, because the Council denied review I may not rely on them to reverse the ALJ's decision.  Luna 22 F.3d at 689.

7

stated that it took twenty to thirty minutes of elevation for the pain to subside. However, the pain returned within twenty to thirty minutes if he was up and doing anything. (Tr. at 285; 290.)

Plaintiff testified that he underwent a femoral bypass, which involved placement of a synthetic artery in his left leg to improve blood circulation, but the leg was still numb from the calf down. (Tr. at 285; 287.) He stated that his legs were lighter than normal and cool to the touch. (Tr. at 285.) He indicated that he tried to walk for exercise but could travel at most six blocks. He stated that he usually used a cane. If he expected to be on his feet a long time, he used a walker. He also had a wheelchair for certain situations. (Tr. at 286.) He stated that he could stand in one spot fifteen minutes at most before his legs started cramping. (Tr. at 288.) Anytime his legs were "down," i.e., he was walking or sitting, he experienced burning in his legs. (Tr. at 289.) He indicated that he could sit for maybe ½ hour before he started having problems. (Tr. at 289.) He stated that his doctors told him his legs would never get better, and he would probably lose them eventually. (Tr. at 287.) The disease ran in his family, and his mother had her legs amputated. (Tr. at 292.) He noted that the disease also created a high risk of infection, causing him to take measures to avoid cuts. (Tr. at 294-95.)

Plaintiff also testified that he underwent back surgery after he blew a disc pushing a wheelbarrow of leaves. He indicated that he could not lift more than thirty pounds without straining his back. (Tr. at 291.) He stated that he usually did not go grocery shopping because it was too hard on his legs and carrying a fifteen or twenty pound bag up one flight of stairs was a "killer." (Tr. at 292.)

Plaintiff testified that on a typical day he tried to get some exercise walking his dogs, but he spent most of the day sitting on the couch. Any housework was punctuated by breaks. (Tr. at 295.) He indicated that he sold his home and moved into an apartment because he could

8

not handle the maintenance anymore.  (Tr. at 296.)

The ALJ, after noting the gap in the medical records between 2003 and 2005, asked plaintiff what sort of treatment he received in the interim.  (Tr. at 300-01.)  Plaintiff stated that "it cleaned up really good" after the 2003 procedure, and that his doctor had him on an aspirin regimen until he returned in 2005.  (Tr. at 301.)  Plaintiff testified that the symptoms he began experiencing in 2005 – including left leg numbness below the knee – were different from those he experienced before the original procedure.  (Tr. at 301-02.)  He stated that his ability to walk and stand got better after the 2003 procedure, "but not much."  (Tr. at 302.)  He indicated that he could walk greater distances and remain on his legs longer, forty-five minutes to an hour, but he was still limited.  (Tr. at 302-03.)  He stated that he had been doing about the same with his walking and standing until he woke up one morning in 2005 and found left leg numb from the knee down, which prevented him from walking and caused him to return to the doctor.  (Tr. at 303.)  He did not see the doctor often between 2003 and 2005; he was hoping and expecting that his condition would improve.  (Tr. at 303-04.)

**2.     VE**

The VE, Michele Albers, classified plaintiff's past work as a furnace operator as heavy, unskilled work; as a shear machine operator as medium, unskilled work; and as a food machine operator, as heavy, unskilled work.  (Tr. at 305.)  The ALJ did not ask the VE about plaintiff's ability to transition to other work, and plaintiff's counsel asked her no questions.  (Tr. at 306.)

**C.     ALJ's Decision**

Following the five-step procedure, the ALJ first determined that plaintiff had not worked

9

during the period between his alleged disability onset (September 2, 2003) and his date last insured (June 30, 2004). The ALJ then found that plaintiff suffered from a severe impairment – peripheral vascular disease – which did not meet or equal the criteria of a Listed impairment. (Tr. at 13.) At step four, the ALJ determined that plaintiff retained the RFC for light and sedentary work with limitations of walking and standing up to four hours in an eight hour day, sitting for up to six hours (two hours at a time), lifting ten pounds frequently, and only occasionally climbing, stooping, kneeling and crouching. (Tr. at 13.)

In making this finding, the ALJ noted that plaintiff underwent an angioplasty in September 2003, which addressed most of his symptoms, and did not seek further medical treatment related to his vascular condition until November 2005, well after his date last insured. The ALJ thus found no evidence that plaintiff's peripheral vascular disease lasted for a continuous period of twelve months or longer prior to his date last insured. (Tr. at 14.) The ALJ further noted that plaintiff first sought treatment for low back pain in May 2005, again post-date last insured. (Tr. at 14-15.) The ALJ thus concluded that, through his date last insured, plaintiff had no impairment or combination of impairments that significantly limited his ability to perform basic work activities. (Tr. at 15.)

Relying on the VE's testimony, the ALJ concluded at step four that plaintiff could not, through his date last insured, perform his past work as a machine operator or furnace operator, performed at the medium and heavy level. (Tr. at 15.) However, he determined at step five that a finding of not disabled was warranted under Grid Rule 202.20. The ALJ found that plaintiff retained the RFC for a full range of light or sedentary work, and that his additional limitations had little or no effect on the occupational base of unskilled, sedentary work. Specifically, the ALJ noted that plaintiff stated he could sit up to two hours at a time and up to

10

ten hours per day. He therefore concluded that plaintiff was not disabled during the relevant time period. (Tr. at 16.)

### III. DISCUSSION

Plaintiff argues that the ALJ (1) failed to make a proper credibility determination, (2) improperly relied on the Grid at step five, (3) incorrectly considered the Listings, and (4) misconstrued Dr. Zwiacher's opinions. I address each argument in turn.

**A.     Credibility**

In evaluating the credibility of a claimant's allegations of pain or other disabling symptoms, the ALJ must, under SSR 96-7p, follow a two-step process. First, the ALJ must consider whether the claimant suffers from some medically determinable impairment that could reasonably be expected to produce the symptoms. If not, the symptoms cannot be found to affect his ability to work. Second, if the ALJ finds that the claimant has an impairment that could produce the symptoms alleged, the ALJ must determine the extent to which they limit his ability to work. SSR 96-7p. In making this determination, the ALJ may not discredit a claimant's testimony about his pain or other limitations based solely on a lack of support in the medical evidence. Villano, 556 F.3d at 562; Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009). Rather, the ALJ must consider all of the evidence, including the claimant's daily activities; the location, duration, frequency and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication the claimant takes to alleviate pain or other symptoms; treatment, other than medication, for relief of pain or other symptoms; any measures the claimant uses to relieve pain or other symptoms (e.g., lying flat on his back, standing for fifteen to twenty minutes every

11

hour, sleeping on a board, etc.); and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

The court is generally required to review an ALJ's credibility determination deferentially, reversing only if it is patently wrong.  Craft v. Astrue, 539 F.3d 668, 678 (7th Cir. 2008) (citing Prochaska v. Barnhart, 454 F.3d 731, 738 (7th Cir. 2006)).  But this deferential standard assumes that the ALJ has actually made an explicit credibility finding.  See Schroeter v. Sullivan, 977 F.2d 391, 394-95 (7th Cir. 1992) ("[W]hile we must defer to an ALJ's credibility assessment of a witness (unless it is patently wrong), we must first be certain that a credibility determination has actually been made.") (internal citation omitted).  SSR 96-7p requires the ALJ to provide specific reasons for a credibility determination, grounded in the evidence and articulated in the decision.  See Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003).  Such reasons may not be implied or supplied later by the Commissioner's lawyers.  Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003).  Failure to comply with these requirements constitutes grounds for remand.  See, e.g., Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003).

In his decision in the present case, the ALJ acknowledged his duty to consider the effect of plaintiff's symptoms, setting forth the two-step test from SSR 96-7p.  (Tr. at 14 ¶¶ 1-3.) However, he failed to then follow those standards: he made no explicit credibility determination; indeed, he did not even mention plaintiff's hearing testimony.[5]  Thus, as in Schroeter: "If the

---

[5]The ALJ also skipped all of plaintiff's pre-hearing written submissions save one, a physical activities questionnaire dated June 23, 2005, from which the ALJ concluded that plaintiff could sit up to ten hours per day and up to two hours at a time.  (Tr. at 16; 80-81.)

12

ALJ disbelieved [plaintiff's] testimony at the hearing, he did not say so in his opinion, and [the court] cannot 'presume that the ALJ disbelieved all of this evidence without any explicit findings to that effect.'" 977 F.2d at 395 (quoting Look v. Heckler, 775 F.2d 192, 195 (7th Cir. 1985)). ALJs need not provide a written evaluation of every piece of evidence, but some minimal level of articulation is essential for meaningful judicial review. See Zblewski v. Schweiker, 732 F.2d 75, 79 (7th Cir. 1984) ("As the Third Circuit put it in Cotter v. Harris, 642 F.2d 700, 705 (3d Cir.1981), when the ALJ fails to mention rejected evidence, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'"). Merely reciting the factors described in the regulations for evaluating symptoms, as the ALJ did here, is insufficient. Steele, 290 F.3d at 942; Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).

The Commissioner responds that plaintiff's testimony and pre-hearing submissions are irrelevant because they did not address the relevant time period: the written submissions described plaintiff's activities one year post-date last insured (June 2005), and his hearing testimony described his condition nearly four years after coverage lapsed (April 2008).[6] Presumably, the Commissioner means to argue that the ALJ's failure to comply with SSR 96-

---

[6]The Commissioner also argues that the ALJ properly assessed plaintiff's credibility, but I cannot agree. The Commissioner is unable to point to an explicit credibility finding in the decision; merely reciting the credibility standard, as the ALJ did on the page the Commissioner cites (Tr. at 14), is insufficient. SSR 96-7p ("It is . . . not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms."). Nor was it sufficient for the ALJ to simply discuss the lack of medical support for the claim. See, e.g., Lopez, 336 F.3d at 540 (holding that an ALJ may not omit an explanation for the credibility determination based on a perceived lack of support for the testimony in the medical evidence); Blom v. Barnhart, 363 F. Supp. 2d 1041, 1055-56 (E.D. Wis. 2005) (reversing credibility determination based solely on lack of medical support prior to the date last insured). In any event, the ALJ never linked evaluation of the medical evidence to plaintiff's credibility, and I cannot assume that the ALJ found plaintiff not credible based on the Commissioner's summary of the medical records. The ALJ, not the Commissioner's lawyers, must specify the basis for the credibility finding. Golembiewski, 322 F.3d at 916.

13

7p was harmless. The harmless error doctrine may be applied in social security cases, see Keys v. Barnhart, 347 F.3d 990, 994 (7th Cir. 2003), but not here.

First, I see no disqualifying time limitation in plaintiff's pre-hearing submissions. Indeed, the ALJ relied upon a statement in plaintiff's June 23, 2005 physical activities questionnaire in determining how long plaintiff could sit. (Tr. at 16.) Obviously, the ALJ did not consider the questionnaire irrelevant to plaintiff's functioning during the relevant time. See Steele, 290 F.3d at 942 (stating that the ALJ, not the Commissioner's lawyers, must must build an accurate and logical bridge from the evidence to the conclusion, and the court's review is confined to the reasons the ALJ provided). In the disability reports he filed with his application, plaintiff explained that while his condition improved after the September 2003 surgery, he still experienced symptoms, and his condition never improved sufficiently for him to return to work. (Tr. at 50; 66.) The written reports also provide explanations for the lack of medical treatment for plaintiff's leg problems between 2003 and 2005 and for his delay in applying for DIB, problems with plaintiff's case the ALJ found significant. (Tr. at 14.) Plaintiff wrote that Dr. Zwiacher told him he would continue to feel numbness in his legs in the months after the surgery, but he hoped his legs would improve over time; instead, his condition got worse. Plaintiff further wrote that he delayed returning to the doctor for his leg problems because he had other medical bills he needed to pay first. (Tr. at 90; see also Tr. at 94.) The ALJ ignored these explanations. See SSR 96-7p ("The adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.").

14

Second, while some of plaintiff's hearing testimony may have pertained to his then-current condition, the ALJ did ask plaintiff questions specifically pertaining to the period of 2003 and 2004. (Tr. at 301.) Plaintiff indicated that his condition improved a "little bit" after his 2003 surgery, "but not much." (Tr. at 302.) He "could walk a little more distance" and stand "a little bit longer." (Tr. at 302.) Plaintiff also discussed his lack of treatment between 2003 and 2005. "They thought it would improve. They thought the aspirin would help." (Tr. at 304.) The ALJ failed to discuss even this specific testimony, which he elicited. Perhaps the ALJ believed this testimony consistent with his determination of plaintiff's RFC during the relevant time,[7] but without some explanation in the decision I cannot assume that. And again, the ALJ failed to consider plaintiff's explanation for the gap in treatment, as required by SSR 96-7p.

Third, I cannot find harmless the ALJ's failure to consider plaintiff's more general testimony. For purposes of his ability to sustain full-time, sedentary work, the most significant aspect of plaintiff's testimony pertained to his stated need to lie down and elevate his feet above the level of his heart. Plaintiff stated that he needed to do this throughout the day, for twenty to thirty minutes at a time, until the pain in his legs subsided. (Tr. at 284-85.) He stated that any time his legs were down, including when he was seated, the pain returned. He indicated that he could sit for maybe ½ hour before he started having problems. (Tr. at 289.) If accepted, this testimony would appear to preclude a full range of sedentary (if not all) work. I note that plaintiff made similar comments in his June 2005 disability report, indicating that the only way he obtained relief from his leg pain was to lie down. (Tr. at 49.) The report thus suggests that this particular problem, at least, existed long before the 2008 hearing. Whether

---

[7]Plaintiff did testify that "it cleaned up really good" after the 2003 surgery. (Tr. at 301.)

15

the testimony accurately described plaintiff's condition during the relevant time is an issue for the ALJ to decide in the first instance. Therefore, the ALJ must on remand consider plaintiff's testimony and statements about his symptoms under SSR 96-7p and make a determination as to their effect on his ability to work during the relevant time.[8]

## B.  Step Five

Plaintiff next argues that the ALJ erred in relying on the Grid at step five. The Grid "is applicable only where it describes a claimant's abilities and limitations accurately." Caldarulo v. Bowen, 857 F.2d 410, 413 (7th Cir. 1988). For instance, because the Grid considers only exertional ability, if the claimant suffers from non-exertional limitations that might significantly reduce the range of work he can perform, the ALJ may not rely on the Grid but must instead consult a VE to determine whether the claimant can perform a significant number of jobs. E.g., Villano, 556 F.3d at 564. Likewise, the Grid does not direct a conclusion of disabled or not disabled where the claimant's "exertional RFC does not coincide with the exertional criteria of any one of the external ranges, i.e., sedentary, light, medium." SSR 83-12.

Here, the ALJ failed to consider plaintiff's testimony about pain, a non-exertional limitation that may by itself be disabling, see Carradine v. Barnhart, 360 F.3d 751, 753 (7th Cir. 2004), or to fully consider all of the evidence pertaining to plaintiff's ability to sit most of the day, as is required to perform a full range of sedentary work, see Aukland v. Massanari, 257 F.3d 1033, 1036 (9th Cir. 2001). As noted earlier, the ALJ pulled one statement out of plaintiff's

---

[8]Plaintiff also argues that the ALJ failed to provide proper notice of the criticality of the date last insured and failed to fully develop the record regarding the relevant time period. Because the matter must be remanded for further proceedings, and plaintiff now has notice of this issue, I need not address whether any due process violation occurred or whether the ALJ failed to develop the record. On remand, the ALJ and plaintiff's counsel can explore more fully plaintiff's condition during the relevant time.

16

June 23, 2005 physical activities questionnaire (Tr. at 16), in which plaintiff indicated that he

sat ten hours in a day (Tr. at 80) and could sit in a car for two hours (Tr. at 81). However, in

the same questionnaire, plaintiff indicated that he spent twelve hours per day in bed (Tr. at 80)

and could not sit long enough to watch a movie (Tr. at 82). The ALJ skipped this portion of the

report, and he said nothing at all about plaintiff's hearing testimony. "An ALJ may not simply

select and discuss only that evidence which favors his ultimate conclusion." Smith v. Apfel,

231 F.3d 433, 438 (7th Cir. 2000). If plaintiff cannot perform the sitting required for a full range

of sedentary work, reliance on the Grid would likely be improper, and a VE should be

consulted. SSR 83-12 (stating that the assistance of a VE is usually required when the

claimant cannot perform a full range of sedentary work).

The Commissioner defends the ALJ's finding that plaintiff's limitations did not

significantly erode the light and sedentary occupational base.[9] See Luna, 22 F.3d at 692

_____

[9]The ALJ's finding that plaintiff could walk/stand up to four hours in an eight hour day seems inconsistent with a full range of light work. The regulations say that light work requires "a good deal of walking or standing," 20 C.F.R. § 404.1567(b), which according to SSR 83-10 is "approximately 6 hours of an 8-hour workday." If plaintiff's RFC fell between sedentary and light work, SSR 83-12 indicates that a VE should be consulted. The ALJ also found that plaintiff could lift ten pounds frequently. But that is not entirely consistent with the regulation either; light work requires "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). The ALJ should take another look at these issues on remand. The ALJ should also clarify his reliance on the Grid. As the Commissioner notes (Commissioner's Br. at 12), the ALJ stated that a finding of not disabled was appropriate under the "framework" of Grid Rule 202.20. (Tr. at 16.) ALJs typically use the Grid as a framework for making a decision when the claimant suffers from both exertional and non-exertional impairments. See, e.g., Fast v. Barnhart, 397 F.3d 468, 470-71 (7th Cir. 2005) (citing SSR 85-15); see also SSR 83-12. If the non-exertional limitations are significant (and exertional limitations alone do not direct a finding of disabled under the Grid), the ALJ may consider the Grid's recommendation as a framework for making a decision, but he must also consult a VE. See id. at 470-72; Samuel v. Barnhart, 295 F. Supp. 2d 926, 929 (E.D. Wis. 2003) (citing 20 C.F.R. § 404, Subpt. P, App. 2, § 200.00(e)(2)). In this case, the ALJ found that plaintiff's non-exertional limitations "had little or no effect on the occupational base of unskilled sedentary work" (Tr. at 16), and he did not rely on the VE at step

17

(affirming use of the Grid where "there was substantial evidence supporting the finding that Luna's claimed non-exertional limitations had no significant impact on his ability to perform the full range of sedentary work.). However, the ALJ's lack of analysis prevents meaningful judicial review of his reliance on the Grid. As the Seventh Circuit held in <u>Zurawski</u>:

> We have clearly stated that where a nonexertional limitation might substantially reduce a range of work an individual can perform, the use of the grids would be inappropriate and the ALJ must consult a vocational expert. <u>Luna</u>, 22 F.3d at 691. Here, as discussed earlier, the ALJ improperly discredited Zurawski's complaints of disabling pain and ignored evidence that might impact Zurawski's ability to work. Zurawski testified that he suffers from debilitating pain that restricts his ability to sit, walk, stand, lift, carry, or bend on a prolonged basis and there is some evidence that appears to bolster this claim. Because we have ordered a redetermination of Zurawski's residual functional capacity and a reevaluation of his testimony, it would be premature to direct the ALJ to solicit vocational testimony from an expert. That said, however, the ALJ must act consistent with the law in this circuit (and the standards set forth in this opinion) if she relies on the grids on remand, <u>see, e.g.</u>, <u>Luna</u>, 22 F.3d at 691-92.

245 F.3d at 889-90. I issue the same directive here. The ALJ must, after reconsidering the evidence consistent with his decision, determine whether to consult a VE at step five.[10]

_____

five. It therefore appears that he used the Grid to "direct" a finding of not disabled, not simply as a framework for making a decision.

[10]Plaintiff notes that he was, as of his date last insured, just eighteen days shy of his fiftieth birthday, a significant event under the Grid. SSR 83-10 provides: "The chronological ages, 45, 50, 55, and 60 may be critical to a decision. However, the regulations also provide that age categories are not applied mechanically in borderline situations. For example, a rule for an individual of advanced age (55 or older) could be found applicable, in some circumstances, to an individual whose chronological age is 54 years and 11 months (closely approaching advanced age). No fixed guidelines as to when a borderline situation exists are provided since such guidelines would themselves reflect a mechanical approach." Plaintiff may, on remand, argue the applicability of this portion of SSR 83-10 to the ALJ. Plaintiff may also press on remand his argument related to his educational level, i.e. whether a GED is equivalent to a high school education. Finally, I note that Grid Rule 202.20, which the ALJ cited, pertains to claimants aged forty-five to forty-nine, capable of light (not sedentary) work, with a high school education and unskilled work experience.

18

**C.     The Listings**

Plaintiff also argues that the ALJ erred in finding that his impairment did not meet a Listing. As indicated above, a social security claimant is deemed presumptively disabled if he has an impairment that meets or equals an impairment found in the Listing of Impairments. Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004). The Listings specify the criteria for impairments that are considered presumptively disabling. Id. A claimant may also demonstrate presumptive disability by showing that his impairment is accompanied by symptoms that are equal in severity to those described in a specific Listing. Id. In considering whether a claimant's condition meets or equals a Listed impairment, the ALJ should mention the specific Listing he is considering and offer more than a perfunctory analysis. Id. Failure to do so may require remand. Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir. 2006).

In the present case, the ALJ wrote: "Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled Section 4.12 or any other listed impairment in [the regulations.] There is no evidence that the claimant's peripheral vascular disease met or equaled the criteria for Section 4.12 for a continuous period of twelve months or longer." (Tr. at 13.) The ALJ's analysis, which appears to rely on the twelve-month durational requirement, is problematic.

A social security claimant must establish disability "by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). As SSR 82-52 explains, "In considering 'duration,' it is the inability to engage in SGA because of the impairment that must last the required 12-month period." See also Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (upholding the SSA's requirement that

19

the inability to work, not just the impairment upon which it is based, last twelve months). Duration of impairment generally "extends from the date of onset of 'disability' to the time the impairment(s) does not prevent the individual from engaging in SGA (or any gainful activity as appropriate), as demonstrated by medical evidence or the actual performance of SGA." SSR 82-52.

However, as SSR 82-52 also explains, the claimant need not demonstrate that by the time the application is decided he has <u>already</u> experienced twelve continuous months of disability. The durational requirement may likewise be met if the impairment "is <u>expected</u> to result in death" or "can be <u>expected</u> to last for at least the required 12-month period." SSR 82-52 (emphasis added).[11] The Ruling sets forth the criteria for the ALJ to consider when the application is adjudicated or a hearing decision is issued before the impairment has lasted twelve months. The Ruling also requires the ALJ to clearly state the basis for denial, that either:

> 1.    Within 12 months of onset, there was or is expected to be sufficient restoration of function so that there is or will be no significant limitation of the ability to perform basic work-related functions.  (See SSR 82-55 (PPS-84: Medical Impairments That Are Not Severe)); or

> 2.    Within 12 months of onset, there was or is expected to be sufficient restoration of function so that in spite of significant remaining limitations the individual should be able to do past relevant work or otherwise engage in SGA, considering pertinent vocational factors.

SSR 82-52.

Because the ALJ adjudicated plaintiff's application several years after his alleged onset

---

[11]The SSA will not grant benefits based on the "expected to last" language if the claimant actually returns to work within the twelve month period, even if such a return would not have been expected at the time of onset. <u>Walton</u>, 535 U.S. at 223. Because plaintiff never returned to work after his alleged onset, this rule has no applicability here.

and the date last insured, he did have to rely on an "expected" duration. He could determine duration based on the historical evidence. However, he could not require plaintiff to meet the durational requirement prior to the date last insured. In order to prevail at step three, plaintiff had to show (1) that he met a Listing on or before the date last insured, and (2) that he met the Listing for at least twelve months. Plaintiff could establish the second element by showing that disability based on the impairment was expected to or in fact did continue after the date last insured, for a total period of twelve months or more.

The Commissioner's Rulings support this construction. See SSR 83-20 (explaining that a worker is not entitled to DIB "unless insured status is also met at a time when the evidence establishes the presence of a disabling condition(s)," and that for "disabilities of traumatic origin, onset is the day of the injury if the individual is thereafter expected to die as a result or is expected to be unable to engage in substantial gainful activity (SGA) (or gainful activity) for a continuous period of at least 12 months.") (emphasis added); see also POMS DI 25501.050 (stating that the claimant must show that the onset of the qualifying medical impairment began on or before the date the claimant was last insured). The cases also generally support this construction. See, e.g., Ivy v. Sullivan, 898 F.2d 1045, 1046-48 (5th Cir. 1990) (awarding benefits where the claimant established an onset date of June 15, 1977, prior to her date last insured of September 30, 1977, and that her disability continued through her application date of April 16, 1985); Dostert v. Heckler, 611 F. Supp. 266, 267-68 (D. Mass. 1985) (rejecting the plaintiff's contention that the ALJ misapplied the law by requiring that the impairment be of disabling severity for a twelve month period prior to the date last insured, where the ALJ acknowledged that the impairment had to be disabling for a period of twelve consecutive months beginning prior to the date last insured); see also Fulmer v. Astrue, No. 08-cv-0159,

21

2009 WL 426050, at *6 (S.D. Ind. Feb. 20, 2009) (noting that evidence from after the date last insured was introduced to establish the durational requirement); Hall v. Astrue, No. 07-cv-34, 2008 WL 4261077, at *12 (N.D. Ind. Sept. 12, 2008) (rejecting claim where the evidence failed to show disability beginning prior to date last insured and continuing twelve months thereafter); Ratto v. Secretary, Dept. of Health and Human Services, 839 F. Supp. 1415, 1427 (D. Or. 1993) ("[Two] impairments may combine to created a continuous period of disability so long as the duration of each impairment, taken separately, lasted or was expected to last for 12 months, and the initial onset of disability was before the insured status date.").

Some courts, in discussing duration and insured status, include the requirement contained in 20 C.F.R. § 404.320(b)(3), that the claimant "file an application while disabled, or no later than 12 months after the month in which [the] period of disability ended."[12]  See, e.g., Costa v. Astrue, 565 F. Supp. 2d 265, 267 n.2 (D. Mass. 2008) ("Under Title II of the Act, Costa must show: (1) a disability beginning on or before her last insured date; and (2) that she remained disabled at least through August of 2001, twelve months prior to her application for benefits."); Ziff v. Chater, 930 F. Supp. 1356, 1358 (N.D. Cal. 1996) ("Plaintiff must show that his disability incapacitated him from performing substantial gainful activity continuously from the date last insured through at least 12 months prior to the date he filed his application."); Solenberger v. Barnhart, No. 01-4117, 2003 WL 22953098, at *3 (D. Kan. Nov. 21, 2003) (collecting cases holding that the claimant must demonstrate disability prior to the expiration of insured status, and either that he was continuously disabled since that time or that his disability did not end prior to the twelve month period before he filed his application).  These

_____

[12]Plaintiff must meet this requirement also.  It appears to be his contention that his disability continued until his application date and to the present.

22

cases are also consistent with the construction adopted herein; disability must exist while the claimant is insured, it must last at least twelve months, and it may not end more than twelve months before the application is filed.

A few district court cases suggest that the durational requirement must be met prior to the date last insured, see, e.g., Tecza v. Astrue, No. 08-242, 2009 WL 1651536, at *7 (W.D. Pa. June 10, 2009); see also Gianotti v. Barnhart, No. 06 Civ. 909, 2007 WL 582755, at *9 (S.D.N.Y. Feb. 22, 2007), but these cases do not appreciate that the finding of disability prior to the date last insured and the finding of duration of the disabling impairment are separate. Nor do they explain how the "expected to last" language in 42 U.S.C. § 423(d)(1)(A) and SSR 82-52 can be squared with such an approach. Disqualifying a person who became conclusively and permanently disabled eleven months before his date last insured from receiving benefits is contrary to the statutory language and common sense.

It is unclear whether the ALJ appreciated the interplay of duration and date last insured. Read separately, each of the two sentences from the decision quoted above appear to correctly state the law; but read together, the ALJ may have been requiring plaintiff to establish a Listing level impairment lasting twelve months before the date last insured. If so, that is an incorrect statement of the law. Other portions of the ALJ's decision suggest that he required plaintiff to meet the durational requirement before the date last insured. For instance, after discussing the medical evidence, the ALJ wrote: "There is no evidence that the claimant's peripheral vascular impairment lasted for a continuous period of twelve months or longer on or prior to his date last insured." (Tr. at 14.) And that: "After considering the evidence of record, the undersigned finds that, through the date last insured, the claimant did not have an impairment or combination of impairments that significantly limited his ability to perform basic

23

work-related activities for 12 consecutive months."[13]  (Tr. at 15.)

When the court cannot be certain that the ALJ applied the proper legal criteria, remand for re-adjudication is warranted.[14]  See, e.g., Scott v. Shalala, 898 F. Supp. 1238, 1245 (N.D. Ill. 1995).  Remand is also appropriate to allow the ALJ to consider plaintiff's testimony as it pertains both to the durational requirement and medical equivalence.  As discussed above, plaintiff testified that his condition improved only marginally after his 2003 surgery; that his symptoms later worsened; and that his doctors stated he would never recover and eventually lose his legs.  This testimony, if accepted, may demonstrate impairment of greater duration

---

[13]This statement also seems to contradict the ALJ's previous finding that plaintiff had a severe impairment – peripheral vascular disease – through the date last insured.  (Tr. at 13.) An impairment is severe if it significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 416.921(a).  As plaintiff notes, the state agency consultants also appeared to find a severe impairment. (Tr. at 144.)  Plaintiff argues that the ALJ failed to specifically consider those opinions as required by SSR 96-6p.  However, I cannot find reversible error based on the lack of analysis.  The opinions, which found plaintiff capable of medium work, greater than the ALJ's RFC, do not appear to support plaintiff's claim. Nevertheless, plaintiff may on remand bring these opinions to the ALJ's attention.

[14]The Commissioner, appearing to acknowledge that the durational requirement need not be met prior to the date last insured, argues that because plaintiff's problem was corrected by the September 2003 surgery, with no residual effects or required treatment through the date last insured, the ALJ was not required to consider whether, through June 30, 2004, plaintiff's condition would be "expected" to last twelve months.  As discussed above, the ALJ skipped evidence casting doubt of the factual predicate of the Commissioner's argument.  Thus, the ALJ must on remand, after reconsidering the evidence, determine whether plaintiff's impairment could be expected to, or did, last for twelve months.  Even if plaintiff did have to meet the durational requirement prior to the date last insured, under SSR 83-20 it is possible to reasonably infer that the onset of a disabling impairment occurred some time prior to the date of the first recorded medical treatment.  Thus, it could be possible for plaintiff to show onset prior to June 2003, one year prior to the lapse of coverage.  The Ruling suggests that the ALJ consult a medical advisor when this issue arises.  Because the ALJ did not find plaintiff disabled at any time, I cannot conclude that he erred in failing to consult a medical advisor about an earlier onset date.  See Scheck v. Barnhart, 357 F.3d 697, 701 (7th Cir. 2004). However, because the case must be remanded for other reasons, the parties may also explore this issue with the ALJ.  SSR 83-20 permits liberal amendment of a claimant's alleged onset date.

24

than the ALJ believed.  Further, ALJs are required in determining whether an impairment medically equals a listing to consider the entire record, including the testimony.  <u>See</u> 20 C.F.R. § 404.1526(c); <u>see also</u> <u>Halvorsen v. Heckler</u>, 743 F.2d 1221, 1226 (7th Cir. 1984) (holding that the ALJ erred in failing to fully consider evidence post-dating the insured period).

## D.    Dr. Zwiacher's Opinions

Finally, plaintiff argues that the ALJ misconstrued Dr. Zwiacher's opinions.  The ALJ quoted from Dr. Zwiacher's November 10, 2005 note, that the majority of plaintiff's ischemic issues were addressed by the September 2003 surgery, and his pain on short distance ambulation significantly improved.  (Tr. at 14; 158.)  From this, the ALJ concluded that plaintiff's vascular impairment was "corrected with surgery in September 2003 with no residual effects or required medical treatment until November 2005."  (Tr. at 14.)  In addition to ignoring plaintiff's testimony contrary to this conclusion, the ALJ also read the note selectively.

Dr. Zwiacher wrote that the "<u>majority</u> of [plaintiff's] ischemic issues <u>above the knees</u> were addressed with that procedure and the significant leg and buttocks pain that he was experiencing on short distance ambulation has significant[ly] improved."  (Tr. at 158, emphasis added.)  As the emphasized portions of the note indicate, Dr. Zwiacher did not conclude that <u>all</u> of plaintiff's problems went away after the surgery, and he limited the improvement to the area above the knees.  Indeed, in the same note, Dr. Zwiacher wrote: "He does have a left foot that appears to have vascular changes."  (Tr. at 158.)  Dr. Zwiacher ordered an MRA, which revealed "significant bilateral peripheral vascular disease."  (Tr. at 158.)  Nothing in the note suggests that this significant disease recurred suddenly, rather than gradually progressing, as Dr. Zwiacher suggested it would shortly after the 2003 surgery.  In his September 18, 2003 letter, Dr. Zwiacher wrote that plaintiff still had numbness in his left foot, and that plaintiff may

25

at some point need a bypass. He deferred the decision on further surgery pending the progression of the disease. (Tr. at 161.) The medical records from 2005 to 2007 show that the disease in fact progressed to the point where plaintiff required bypass surgery.

The ALJ may not deny a claim based on a selective reading of the record. See Smith, 231 F.3d at 438. Therefore, the matter must also be remanded for reconsideration of Dr. Zwiacher's opinions. The ALJ may on remand wish to re-contact the doctor to obtain clarification of plaintiff's condition during the relevant time.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and the matter is remanded for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 23rd day of June, 2009.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge